GRANT L. BRIGGS *et al.*, Plaintiffs-Appellees, v. DALE ALLEN GADDIS *et al.*, Defendants-Appellants (Marathon Oil Company, Defendant-Appellee).

Fifth District   No. 5—84—0482

Opinion filed April 12, 1985.

JONES, P.J., dissenting.

E. H. Price and Mark Shaner, both of Robinson, for appellants.

Thomas J. Logue, of Glenn & Logue, of Mattoon, for appellees Grant L. Briggs and Davana M. Briggs.

JUSTICE WELCH delivered the opinion of the court:

Plaintiffs Grant and Davana Briggs brought this action for a declaratory judgment that they were entitled to one-half of the royalties from an oil and gas lease covering a 13-acre tract of land owned by the Briggs and a 40-acre tract adjacent to it. The Briggs also sought payment by defendant Marathon Oil and Gas Company (Marathon) for

their share of royalties due and owing. Defendants Dale and Ann Gaddis are the owners of the adjacent 40-acre tract; defendant Virginia Walker is a partial assignee of the mineral rights as to the tract owned by the Gaddises. After a bench trial, the circuit court of Crawford County granted the relief sought by Briggs. Mr. and Mrs. Gaddis and Ms. Walker appeal. We affirm.

In 1907, lessors Marion D. Eaton *et al.* executed an oil and gas lease to the lessee, the Ohio Oil Company, of 53 acres in Crawford County. The minerals under the entire 53-acre tract were owned by the same people until September 9, 1931, when the ownership became divided, with Rosa Coffman becoming the owner of the minerals under the east 40 acres and Elizabeth Eaton becoming the owner of the minerals under the west 13 acres. The lease contained no entireties clause. Instead, an oral agreement was made between the two owners that they would each receive one-half of the royalties for all oil produced from the entire lease, regardless of whether such oil was produced from the 13-acre tract or from the 40-acre tract. All the oil was collected in a single tank battery.

The arrangement continued through the various subsequent owners of the two tracts, with such owners signing various "division orders" (*i.e.*, agreements) setting out the agreed arrangement. The last division order was on July 21, 1955, when there was one producing well on the 40-acre tract and one on the 13-acre tract. The division order provided that, by agreement, the royalty from oil produced would be split equally by the owners of the tracts and their successors in title "until such time as secondary recovery methods may be put in operation on the premises." Sometime thereafter Marathon succeeded the Ohio Oil Company and began paying out the royalties. The Briggs acquired the minerals under the 13-acre tract in 1960. Mr. and Mrs. Gaddis acquired one-half of the minerals under the 40-acre tract in 1972, and Ms. Walker acquired another one-half of the minerals under the 40-acre tract in 1977. From October 1971 until May 1974, there was no production from the 40-acre tract. The operator of the lease during most of 1975 was Henry Halley. Halley notified Gaddis that he was going to begin waterflood operations. He obtained an easement from Gaddis for the power source for the waterflood system, began construction of a new tank battery, and plugged the well on the 13-acre tract. Halley informed Gaddis that he would have his attorney prepare the necessary agreement and documents for the waterflood. Before the documents were prepared, Halley's attorney died, and Halley sold out to a new operator, C. E. Billingsley. No papers for the waterflood were ever prepared, submitted, or signed, and the area of

the waterflood was never defined.

In early 1975, Briggs approached Gaddis to propose exchanging royalties so that each would own all the royalty for their respective tracts, but Gaddis was not interested in exchanging royalties at this time. Later, Gaddis observed the setting of stakes on the tract "on pattern" and, believing a waterflood was imminent, went to Briggs to discuss exchanging royalty interests, but at this time Briggs was not interested in proceeding with the exchange. Gaddis then notified Marathon Oil Company, the oil purchaser, by letter that the contract had terminated because the sole producing well on the 13-acre tract was plugged. In the letter, he failed to mention that he believed secondary recovery methods had commenced. Marathon started withholding royalty payments from the Briggs.

During 1977 and 1978, the operator, Billingsley, drilled new wells on the 40-acre tract. Billingsley also applied for and received a permit to drill a salt water input well. He then had the salt water input well drilled in the center of the 40-acre tract.

In 1978, Billingsley started injecting water into the subsurface through an input well on the 40-acre tract on gravity alone. In 1982, he started injecting water under pressure. Billingsley testified at trial that he injected the water into the same formation from which the oil was produced because that was the only good body of sand that would take the water. He testified that the 53-acre lease was not desirable to be used in a waterflood by itself because the geological structure was bigger than the 53-acre tract. He also stated that he had allowed two other operators to dump "a load or two" of salt water left from leases that they operated into his well and that all the salt water from his other leases was not going into the input well. He further testified that he drilled two new wells on the 13-acre tract in 1983. The oil production of the well started increasing 2½ years after he started disposing of the salt water in the input well.

On March 30, 1983, Briggs filed a complaint asking (1) for a declaration that he was entitled to one-half of the proceeds from royalties from the 53-acre tract pursuant to the 1955 division order and (2) for an order directing Marathon to pay the proceeds it had withheld. The amended complaint was based on contract, waiver, and estoppel. The trial court granted the relief sought under the contract and waiver theories. A motion to reconsider was denied Mr. and Mrs. Gaddis and Ms. Walker, and they subsequently filed their notice of appeal.

■ The sole issue raised on appeal is whether the trial court's finding that no secondary recovery methods had been put in operation on the lease was against the manifest weight of the evidence.

It is well settled that a judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 1088-89, 401 N.E.2d 1145, 1153.

In the case at hand, the permit for drilling a "water input" well and the application for the permit were introduced into evidence. No "waterflood" permit was issued by the Department of Mines and Minerals. Mr. Briggs testified that as far as he knew the 13-acre tract he owned had not been placed into any kind of waterflood unit. Mrs. Briggs testified that she never discussed a waterflood with Halley or Billingsley.

The operator, Billingsley, stated under oath that he injected the water into the same formation from which the oil was produced because that was the only good body of sand that would take the water. He testified he was familiar with a waterflood, with what it took to put one together, with the permits you would have to obtain before you started to put one together, and with the publication requirements. He also testified that he wouldn't try to put in a big waterflood with that small amount of acreage. He further stated that for a waterflood he would "get acreage and drill and put around the outside," thus driving the oil to a central well.

In response to a question on redirect as to whether or not the well was part or all of a waterflood unit, the operator answered: "It has helped production, yes, sir." When he was asked if it was a waterflood in accordance with the rules and regulations of the Department of Oil and Gas and if it is a "secondary recovery unit," he equivocally stated: "Well, it has helped so I guess you could say partially, in a way."

Mr. and Mrs. Gaddis and Ms. Walker contend that the aforementioned testimony at trial showed that the well in question was much more than a mere salt water disposal well. They claim instead that it was a waterflood operation. Therefore, because secondary recovery methods were being employed, they contend the agreement terminated. Their argument is centered on the fact that oil production was increased as a result of salt water being injected into the salt water disposal well.

However, the trial court, basing its opinion on the "testimony of witnesses, exhibits, and the Illinois Statutes," found that secondary recovery methods had not been employed. In order to determine whether the trial court's finding was in accordance with the manifest weight of the evidence, we must understand the pertinent terms in

question.

The term "secondary recovery of oil" is defined as "the production which may be obtained by the injection of gas, air, water or other substance into the reservoir for the maintenance, increase or renewal of the reservoir pressure." (1 Summers, Oil & Gas sec. 76, at 235-36 (2d ed. 1954).) Mr. and Mrs. Gaddis and Ms. Walker contend that the evidence adduced at trial shows that the operator of the lease was injecting water-made pressure into the formation from which the oil was being produced, and thus secondary recovery in the form of a waterflood was taking place. However, the similarities between a secondary recovery water input well and a disposal well include the possibility of increased production of oil. Williams and Meyers' Manual of Oil and Gas Terms defines salt water disposal as "[t]he disposition of salt water produced with the oil from a reservoir." However, the manual further states: "[I]n the case of East Texas Field, the water was returned to the reservoir, below the oil-water contact line, thus maintaining reservoir pressure and increasing the ultimate recovery from the field." Thus the mere disposition of salt water, even when one is not conducting a waterflood, may inadvertently increase the recovery from the field and may not be secondary recovery *per se.* 8 Williams & Meyers, Manual of Oil & Gas Terms 790-91 (1984).

Williams and Meyers' Manual of Oil and Gas Terms incorporates both terms, "secondary recovery" and "salt water disposal," into their definition of an injection well. They describe an injection well, which is synonymous with an input well, as "[a] well employed for the introduction into an underground stratum of water, gas, or other fluid under pressure. Injection wells are employed for the disposal of salt water produced with oil or other waste. *** They are also employed for a variety of other purposes including: (1) Pressure maintenance ***; (2) Cycling ***; (3) Secondary recovery ***; and (4) Tertiary recovery ***." Thus not all injection wells are involved in secondary recovery. 8 Williams & Meyers, Manual of Oil & Gas Terms 790-91 (1984).

Usually, unitization is necessary to undertake a secondary recovery program. The unitization or consolidation of separate leases or tracts covering an entire pool or field, or a substantial part thereof, for development and operation as one unit is accomplished either by a voluntary agreement or by statute. Mineral Law sec. 6—84 (Ill. Inst. Cont. Legal Educ. 1982).

Defendant's theory is that a waterflood was put into operation only on the 40-acre lease. In support of that theory, Gaddis testified that the previous operator had wanted to put in a waterflood, but the

papers were never prepared or signed. He further stated that the previous operator had started the construction of a new tank battery, which is now overgrown with weeds. No explanation was offered as to why, other than inconvenience, the numerous requirements for a waterflood were not complied with.

The findings and judgment of the trial court in nonjury cases will not be disturbed by the reviewing court if there is any record evidence to support the finding. *Schioniger v. County of Cook* (1983), 116 Ill. App. 3d 895, 899, 452 N.E.2d 783, 787.

Given the permit for a water input well, the failure to follow statutory procedure for establishing a waterflood as set out in section 8b and section 23.1 of "An Act in relation to oil, gas, coal and other surface and underground resources ***" (Ill. Rev. Stat. 1977, ch. 96½, pars. 5414, 5438), the small amount of acreage involved, the rather lengthy period of injecting water on gravity alone, and the fact that all of the salt water produced from Billingsley's other leases was not going into the water input well, the trial court's findings were warranted.

Thus, we conclude, after thoroughly examining the record in the case at hand, that there is substantial evidence to support the findings of the trial court that "the water injection well is not or was ever intended to be a prime means of secondary recovery" and that the trial court's findings are not unreasonable or arbitrary. See *Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 1088-89, 401 N.E.2d 1145, 1153.

For the foregoing reasons, the judgment of the circuit court of Crawford County is affirmed.

Affirmed.

KARNS, J., concurring.

PRESIDING JUSTICE JONES, dissenting:
I must respectfully dissent.

In determining that the operator of the leases in issue here, Billingsley, had not instituted a "secondary recovery method," the trial court and the majority obviously placed great reliance upon the fact that the State of Illinois had not issued a permit for a waterflood (a secondary recovery method). It might be facetiously said that oil-producing formations are not flooded with State permits, they are flooded with water. Some further reliance was seemingly placed upon the fact that the input-recovery method utilized by Billingsley on the

Gaddis 40 acres was not that generally followed in permit-authorized secondary recovery operations.

The record contains an order on pretrial conference signed by all the parties. One of its provisions was that the division order containing the special clause in question "constituted a legal and binding Contract between the parties who signed it, including the Plaintiffs and the Defendants, Dale Allen Gaddis, Anna Lee Gaddis, and Virginia R. Walker." The special clause of the division order dated July 21, 1955, read:

> "This supplemental division order is filed to evidence the fact that it is mutually satisfactory to all the undersigned parties that payment be made to them and/or their successors in title as hereinabove set out for the entire $\frac{1}{6}$ R.I. in this 53-acre lease, effective with all oil run on and after July 1, 1955, until such time as secondary recovery methods may be put in operation on the above described premises ***."

This same special clause was also inserted into the division order dated August 30, 1951. This is important to note, since it evidences an agreement of long standing among the royalty owners of the 53 acres regarding the consequences of the institution of secondary recovery methods. What Billingsley did on the Gaddis lease was, without question, a method of secondary recovery of oil from that lease, and Billingsley admitted that it was. Moreover, the Billingsley operation on the Gaddis 40 acres constituted waste and was contrary to Illinois statutes prohibiting waste. The consequence of the decision of the trial court and the majority is that the defendant royalty owners have been deprived of their rights under their contract and have lost a full one-half of the royalty payments assured them by the contract.

In considering whether the Gaddis lease was being subjected to secondary recovery methods by Billingsley, it would be advisable to keep in mind that he had, by his own testimony, over 40 years' experience in the oil business, consisting of drilling, producing and *flooding*. He obviously knew that he was installing a secondary recovery by waterflood, and that is plainly shown by both his actions on the Gaddis 40 acres and his admissions in his testimony.

At the time Billingsley acquired the Gaddis lease it had one producing well in a corner location. In due course he drilled three additional producing wells to the same producing formation in the remaining corner locations on the Gaddis 40 acres. He then drilled the "saltwater disposal" well in the middle of the 40 acres and began injecting water into the producing formation, at first by gravity flow but later under pressure. The very natural, and known, consequence

was that the injected water drove the oil from the injection well to the four producing wells on corners of the 40 acres. The resulting great increase in the production of oil from the Gaddis 40 acres is detailed in the record and candidly attributed to the "saltwater disposal" well.

Aside from the admissions of Billingsley, there is a sure indication that a secondary recovery by waterflood was knowingly installed by him, and that indication is found in the fact that three additional, and presumably very expensive, production wells were drilled by Billingsley contemporaneously with the drilling of the disposal well. If Billingsley, or any other operator, was drilling a well solely for saltwater disposal, it would not be either necessary or desirable to drill any additional production wells.

If further confirmation of secondary recovery from the Gaddis 40 acres should be needed, it is to be found in the testimony of Billingsley himself, given on cross-examination:

"Q. And that water input well does exactly the same thing, absolutely and completely the same thing as a waterflood well on the same place for the same purpose, doesn't it?

A. Yes.

Q. Absolutely no difference except the name?

A. Right."

In closely related testimony, Billingsley related that the greatly increased production from the Gaddis 40 acres was directly attributable to the injection of water. His further testimony indicated that he was familiar with the requirements to be fulfilled in getting a State permit for a secondary recovery operation and that he was also familiar with the traditional methods of secondary recovery by waterflood whereby water is injected into the periphery of an oil-bearing formation to drive the oil to production wells at the center of the formation.

It is obvious in this case that Billingsley conducted the somewhat unorthodox, but nevertheless effective, waterflood operation on the Gaddis lease because it was easy, relatively cheap and did not require that he become involved with any other persons or production companies. He did not make application to the State for a permit to conduct secondary recovery by waterflood because he knew it would not be granted. His chosen method of waterflooding of a single 40-acre tract was inefficient, could not be confined in its effect upon the producing formation to the 40-acre tract, and would be wasteful of the oil reserves in the formation. Each of these factors is contrary to State policy to protect oil reserves, prevent waste and protect owners of royalty and oil and gas leasehold interests.

It is true that Billingsley had a State permit for a water injection well on the Gaddis 40 acres. However, the application and representations submitted to the State Department of Mines and Minerals are not in the record. The permit is suspect, since it authorizes injection of water for disposal purposes that is squarely contrary to statutory provisions and prohibited as waste. Section 1 of "An Act in relation to oil, gas, coal and other surface and underground resources ***" (Ill. Rev. Stat. 1977, ch. 96½, par. 5401) defines waste, as related to this case, as:

" 'Waste' means 'physical waste' as that term is generally understood in the oil and gas industry, and further includes:

* * *

(3) the drowning with water of any stratum or part thereof capable of producing oil or gas, *except for secondary recovery purposes*." (Emphasis added.)

Section 1.1 of the same Act (Ill. Rev. Stat. 1977, ch. 96½, par. 5402) provides:

"Waste as defined by this Act is prohibited."

In conclusion, it should be noted that the owners of the royalty under the Gaddis 40 acres will never be able to collect the bargained-for royalties that would arise from installation of secondary recovery methods on their lands. Secondary recovery has already been instituted and can never be reversed, or repeated.

I would reverse.