JERRY FREESE *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. HOWARD BUOY, Defendant-Appellant and Cross-Appellee.

Fifth District    No. 5—90—0335

Opinion filed July 24, 1991.

Edward T. Graham, Jr., of Hershey, Beavers, Periard & Graham, of Taylorville, for appellant.

Mitchell K. Shick, of Heller, Holmes, Hefner & Eberspacher, Ltd., of Mattoon, for appellees.

JUSTICE LEWIS delivered the opinion of the court:

The plaintiffs, Jerry Freese and Becky Freese, husband and wife, brought suit against the defendant, Howard Buoy, in two counts, one for breach of a sharecropping agreement and another for trespass. In each count the plaintiffs sought compensatory damages of $3,750 and

punitive damages of $50,000. This cause of action arose when another farmer, Charles Shuff, who, like the plaintiffs, had a sharecropping agreement with the defendant, "moved" acreage planted in oats by the plaintiffs, as part of a "set aside" program of the Federal government, to another location on the farm owned by the defendant. Charles Shuff is not now and never has been a party to this lawsuit. Following a bench trial, the trial court entered judgment in favor of the plaintiffs and against the defendant on both counts, awarding nominal compensatory damages of $1, court costs, and punitive damages of $6,165. The defendant appeals, presenting two issues for review: (1) whether a landowner may be held liable for the actions of his independent contractor tenant which constitute a trespass to land and (2) whether a landowner may be held liable to pay punitive damages to a third-party because of the actions of his independent contractor tenant which constitute a trespass to the land of the third party. With respect to the first issue, the defendant maintains that there is no evidence in the record to substantiate the plaintiffs' claim of trespass and that the record is devoid of facts evidencing a relationship of principal and agent between the defendant and Charles Shuff. With regard to the second issue, the defendant urges that in the absence of any relevant admissible evidence of some "outrageous" behavior on the part of the landlord, assuming the landlord was liable for damages at all, any award of punitive damages in favor of the plaintiffs is clearly inappropriate. The plaintiffs filed a notice of cross-appeal asking that the judgment for nominal damages be reversed and that this court either enter an *additur* or remand for a retrial solely on the issue of compensatory damages.

Called as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102), the defendant testified that, after buying the farm, he had contacted Charles Shuff about farming that part of the property not leased to the plaintiffs for 1988. The plaintiffs had leased 55 acres under a sharecropping agreement with a prior owner of the property, which lease was assigned to the defendant upon his purchase of the property. The defendant and Charles Shuff "discussed the [plaintiffs'] idle acres," that is, the approximately 15 acres set aside. They discussed the location of the set aside and the designation of other acreage as the set aside. Charles Shuff told defendant that the plaintiffs' set aside contained "good land."

During that meeting they discussed planting beans in the 15-acre set aside. Asked, "And did you decide to go ahead and plant beans there?" the defendant answered, "We decided at that time to go to

the ASCS [Agriculture Stabilization Conservation Service] office and get a change, Mr. Shuff was going to talk to them about changing it." Asked further, "And you instructed Mr. Shuff to go to the ASC office?" the defendant responded, "I said it was fine. If he could get it done, we ought to do it." The defendant never contacted the ASCS office himself prior to the moving of the set aside. The defendant did not recall the plaintiff Jerry Freese's having told him that he could not move the set aside. Asked, "At some point in time, Mr. Buoy, did you instruct Mr. Shuff to transfer the Freese set aside and plant beans?" the defendant stated, "I okayed his suggestion to transfer the idle acres with the idea that beans would be planted there." Asked further, "And you gave them [*sic*] the okay then to contact the ASCS office with regard to that, is that correct?" the defendant answered, "I am trying to remember what I said before. I think I just said if you think that's the thing we ought to do, we ought to do it."

The plaintiff Jerry Freese testified that on the 55 acres leased he had planted approximately 40 acres in wheat and approximately 15 acres in oats as the "cover crop" in the set aside acreage. He had finished planting the oat crop "at the last of March." After the defendant purchased the property, the plaintiff had, he said, offered to sell his lease to him "for the wheat and the set aside," but the defendant had indicated the price sought by plaintiff was too high and did not accept the offer. The plaintiff added, "Well, I mentioned in the deal that if he bought me out, well, you know, he would have the best ground to his favor, you know, because I had the best ground, I figured, leased." Upon declining the plaintiff's offer, the defendant did not ask him whether he could designate other acres as set aside. The plaintiff never saw or talked with Charles Shuff prior to the change concerning the set aside. The plaintiff testified that he had learned in the first part of May that his oat crop had been destroyed and that the 15 acres where the oats had been were planted in beans. The plaintiff had not given permission to defendant or to Mr. Shuff to go on the land. Upon discovering that the oat crop had been removed, the plaintiff's wife called the defendant. Later that same day Jerry Freese called the defendant. At that time the defendant stated, according to Jerry Freese, that "you had the best ground tied up" and that "they shouldn't have rented you the best ground for set aside." On cross-examination the plaintiff testified that prior to June 20 of 1988 a farmer could change the location of a set aside.

The plaintiff Becky Freese testified concerning a conversation between defendant and her husband at the plaintiffs' home following the

defendant's purchase of the farm and prior to the removal of the oat crop:

> "He [Jerry Freese] explained to him [defendant] where the set aside was and at that time was the time he said that if he was interested in the wheat and did in fact buy the wheat, he could take our set aside, move it wherever he wanted to. Otherwise, it was our 55 acres. He couldn't really touch it."

Called by the plaintiff as a witness, Charles Shuff testified that the defendant had told him in the first conversation he had had with him that Shuff would be farming all of the land except for that farmed by the plaintiffs. At a later meeting with the defendant, at which the witness' son Scott and a friend of the defendant named Betterton were present, by which time the witness had become aware that the 15 acres in question had been worked and drilled, the witness and the defendant talked about relocating the acreage set aside. Asked, "During that second meeting, did you and Mr. Buoy decide to move the set aside that Mr. Freese had planted or had worked up?" the witness answered, "It was suggested we check with the ASCS to see if it was possible to move it." Asked whether the defendant had told him to do that, the witness responded, "He wanted to know if I would check it, yes." Asked, "Mr. Shuff, did Mr. Buoy tell you what to do if the ASCS office had no objection to moving the set aside?" the witness stated, "To do whatever the ASCS said, yes." The defendant did not ask the witness to check with the plaintiffs. The witness and the defendant said that the soil in the set aside "was possibly better soil" and discussed planting the set aside in beans. After this meeting the witness did not talk with the defendant prior to cultivation of the set aside by the witness on approximately May 10, 1988. Asked, "Was there an existing crop visible at the time you pulled the field cultivators through it?" the witness answered, "Hardly any," and added, "It was just a bare field except for just a little around the edges." The witness "could see what was up was oats."

On cross-examination when the witness was asked, "Did you request of [the defendant] that or at least advise him that you wanted to move the set aside to some place else and that that would be more productive?" he answered, "That was in the conversation. I don't know whether I requested that or not." Asked, "Did [the defendant] advise you during that same conversation that you could do it if it was okay with the ASCS office?" the witness responded, "Yes." The witness contacted the ASCS office.

Testifying in his own behalf, the defendant stated that he had purchased the farm where the 55 acres are located from the Federal

Land Bank in April of 1988 and that he has no experience in operating a farm. He indicated that he had discussed the idle acres once, in the presence of Charles Shuff and his friend Betterton. The defendant recalled the conversation in general as follows:

> "I know it was something that the land, that the set aside land was some of the best land, it was level, fairly level in comparison to parts of the other farm and it was better soil and they said they ought to move, we ought to move the idle acres and I don't know who said it whether it was Charlie Shuff or Betterton or somebody, but they said we ought to move the idle acres and I said something, questioned them about well, can you do that and they said yes, you can get it done, all you have to do is go to the ASCS office and tell them about it and have it moved and they said well, we ought to do it and I said well, if they let you do it, that's fine."

Asked whether he had essentially listened to what everyone else had to say during this conversation, the defendant responded, "I didn't really know that much about farming so I couldn't, I just listened mostly." The following questions were directed and answers provided:

> "Q. And your response was if they could do it, fine?
>
> A. Fine.
>
> Q. And who—did anybody offer to look into that?
>
> A. Charlie Shuff said he would take care of it.
>
> Q. He would take care of the whole thing?
>
> A. Uh-huh.
>
> Q. Did he ever get back to you and tell you what happened after he talked to the ASCS office?
>
> A. Not until after they planted it. At the time I got the complaint.
>
> Q. So you didn't have any knowledge at all until after you heard from Mrs. Freese that the oats had been tilled under?
>
> A. No."

At no time prior to the call from Becky Freese, the defendant said, did he discuss the matter with anyone at the ASCS office.

On cross-examination, when asked, "And when the subject of set aside came up, you knew that the subject was concerning Mr. Freese's set aside, is that correct?" the defendant answered, "It was a government set aside as far as I knew. I didn't understand that part of it." He indicated he did not ask whether the set aside could be relocated: "They were talking about it and I said well, if you can do it, go ahead." Asked, "And you knew that if the set aside would be moved, it would be Mr. Freese's set aside?" the defendant responded,

"I didn't know whose set aside it was, whether it was the government's or the Freese's [*sic*] or Shuff's or mine."

On redirect examination the defendant testified that he had never directed anyone either to take any action to move the set aside or to "cultivate under Mr. Freese's oat crop." On re-cross-examination, when the defendant was asked, "Mr. Buoy, you knew that when the set aside would be moved that beans would be planted, your beans in their place, is that correct?" he answered, "I knew that beans would be planted there, yes." Asked, "And you knew that in planting the beans, they would have to disc it up and then plant the seeds, is that correct?" he responded, "Sure, yes." Upon further redirect examination the defendant testified that at the time he had no knowledge of the rules and regulations of the ASCS with respect to set aside and where it is placed and how it is moved. He indicated further that he knew "a little bit" about ASCS rules and regulations concerning what is planted on set aside and what such a crop can be used for. He indicated that he did not know generally whether anyone could ever obtain authority to move the set aside in question from one place to another. Upon further re-cross-examination he stated that he had made no effort to find out whether the set aside was covered by the lease, adding, "My tenant was going to do that."

Called as a witness on behalf of the defendant, Charles Shuff testified that he has been farming since 1954, that he has planted oats about every third year, and that he and the defendant in 1988 had entered into a cropsharing agreement whereby they shared equally the profits and expenses associated with the planting and harvesting. Charles Shuff was also participating in a program whereby he had to set aside some acreage. The witness stated that when the subject of moving the plaintiffs' set aside came up during his conversation with the defendant, the latter's response was that he "[w]ondered if it was permissible and I said we would have to go through the ASC office to see." The witness stated that he offered to do so and, in fact, "[w]ent over to the ASC office and asked if it was permissible." Based on what Shirley Pfeiffer at the ASCS office told him, he said, he "[p]roceeded with our layout." The witness did not think he had talked with the defendant until after he had removed the oats and planted beans on the 15 acres. The witness planted oats and clover in the acreage to be set aside with respect to his own corn crop and in the acreage to be set aside with respect to the plaintiffs' wheat crop. On about May 10, 1988, without having contacted the plaintiffs, he went into the field where their oats were planted, which he described as "a pretty bare field," with "[j]ust little oats around the edge of it." When he

went to this field, he said, "We seen there was no crop there so we decided we would go ahead with what we had told ASC and put beans in it." Asked, "So if you had gone out to that field and seen that there was a crop there, what would you have done?" he responded, "Left it." Asked further, "Under any circumstances, would you have plowed under a crop if there was something there that looked reasonable?" he answered, "No." He added, "I wouldn't have done it if there had been a crop there, no." Dry weather, he said, had killed the oats. On cross-examination he responded in the affirmative to the question, "And because this stand of oats in your opinion wasn't worth very much, you thought it would be okay to destroy what little value was there?"

Called by the defendant as a witness, Shirley Pfeiffer testified that she has been employed by the Shelby County ASCS office for 30 years and is responsible for administering the wheat and feed-grain programs. She stated that once a tract of land is designated or certified as set aside, it can never be combined and the only purposes to which it may be put are grazing or haying if the county has been declared by the government to be a "disaster county" and the farmer has obtained special permission to use it for those purposes. Because 1988 was a "disaster year," a farmer could hay his set aside after August 31 of that year if he had applied to do so. Even though the plaintiffs' land had been "premeasured" with respect to a set aside, the set aside could have been changed "anywhere on the farm" through June 20, 1988, the final certification date. On March 2, 1988, she testified, the plaintiff had come into the office to designate his set aside acreage; at that time his set aside acres had not been seeded. Had the Freeses wished to designate another tract of land as set aside, they could have done so, the witness indicated, at any time through June 20. On April 27, 1988, the witness testified, Charles Shuff came into the office. "[W]hen he was in there getting premeasurement for the rest of the farm, another girl premeasured him and she [Peggy Witt] came and asked me for permission if they could move the set aside." The witness did not talk to Charles Shuff but "gave her permission to move the set aside and put it all where he wanted for both the wheat and the corn program." The witness testified, "Peggy Witt came to me because Charlie Shuff had asked permission if it was possible for him to move the wheat set aside [the plaintiffs' set aside] to elsewhere on the land." She stated further that "since it was not seeded—as far as I know, it was not seeded, I gave her permission or gave Charlie Shuff permission to move it." The new designation was entered in the records at that time: "Peggy Witt moved it on her new

premeasurement form." The witness indicated that no one had asked for early certification of the plaintiffs' set aside or advised her that their set aside acres had been planted in oats. At the end of the season Mr. Freese received his government payment for the acres set aside, which payment was not affected by the change in the location of the acreage.

The trial court asked this witness a number of questions for "clarification of what happened on April 27":

> "Mrs. Pfeiffer, if anyone had come into that office be it Mr. Shuff or some other person and said that they wanted to move Mr. Freese's set aside, would that permission have been granted?
>
> WITNESS: As long as I know [sic] it had not been seeded and I knew that the right amount of set aside for both the wheat and the feed program were going to be maintained, I would have allowed it.
>
> THE COURT: So it didn't matter whether Mr. Freese wanted it moved or didn't want it moved?
>
> WITNESS: No. If he would have had it seeded, he should have come back in for another signature.
>
> THE COURT: If he hadn't done anything and Mr. Shuff had not come in and asked to have the set aside moved, would Mr. Freese have been under the program based on his prior meeting with you?
>
> WITNESS: We would have had to have known it was seeded before it would have been good set aside.
>
> THE COURT: So if he had not come back at all, he would not have qualified for the set aside program?
>
> WITNESS: Because it was not seeded because all set aside is required to have a cover on it unless they have a clean tillage permission just to maintain and keep the weeds down.
>
> THE COURT: So if I had come in to you on August [sic] 27 and said I want to move Mr. Freese's set aside, you would have done that and Mr. Freese would have qualified under the program?
>
> A. Yes."

For further clarification defendant's counsel inquired of the witness:

> "Q. Mrs. Pfeiffer, as opposed to anybody, is there any regulation or requirement that the person who comes in and asks to designate the set aside have some relationship to the land?
>
> A. Absolutely. He has to be an operator.

Q. So if I come in, the lawyer from Taylorville that doesn't know anything about farming and has never seen that 380[-]acre tract of land and I say I want to move Mr. Freese's set aside, will you allow me to do it?

A. No. It has to be an operator. We have people listed as OT, that is other operators or an owner before we would have allowed anyone. That's what I thought you meant by anyone.

Q. So in this particular case, it would have allowed Mr. Buoy, Mr. Shuff or Mr. Freese to change the set aside designation?

A. Yes."

In their amended complaint the plaintiffs alleged in the first count, for breach of contract, that in causing or directing Charles Shuff to trespass upon their property and to destroy their crops the defendant breached the terms and conditions of the farm lease between them and the defendant. In the second count, for trespass, they alleged that the defendant caused or directed Charles Shuff to trespass upon their property, to destroy their oat crops, and to plant his own crop there. In his brief defendant asserts that his "liability in contract, therefore, must arise or fail upon his responsibility for Tenant's [Shuff's] trespass to Freese's land."

■■ Trespass is an intentional invasion of the exclusive possession and physical condition of land (*Dietz v. Illinois Bell Telephone Co.* (1987), 154 Ill. App. 3d 554, 507 N.E.2d 24.) One can be liable in trespass for an intrusion by a thing or third person if he acts with knowledge that his conduct will, to a substantial degree of certainty, result in the intrusion. (*Dietz*, 154 Ill. App. 3d 554, 507 N.E.2d 24.) In other words, a person must know with a high degree of certainty that the intrusion will naturally follow from his act before liability for trespass attaches. (*Dietz*, 154 Ill. App. 3d 554, 507 N.E.2d 24.) Thus, a person who aids, abets, assists, or directs the commission of a trespass by another is liable for trespass. *Dietz*, 154 Ill. App. 3d 554, 507 N.E.2d 24.

■■ The judgment of the trial court will not be reversed on review unless it is manifestly contrary to the evidence in the record. (*John J. Calnan Co. v. Talsma Builders, Inc.* (1979), 77 Ill. App. 3d 221, 395 N.E.2d 1076.) As the defendant states, a judgment is contrary to the manifest weight of the evidence only when an opposite conclusion is apparent or when the trial court's findings appear to be unreasonable, arbitrary, or not based upon the evidence (*Briggs v. Gaddis* (1985), 133 Ill. App. 3d 704, 479 N.E.2d 350.) However, we must disagree with the defendant that the instant record is barren of evidence in support of the trial court's decision and, for that reason,

must be reversed. The trial court could have concluded that under the circumstances the defendant knew with a high degree of certainty that the intrusion by his tenant Shuff onto part of the property leased by his other tenants, the plaintiffs, would occur if Shuff found at the ASCS office that the set aside could be located elsewhere on defendant's farm, that is, on part of the property leased by Shuff. The defendant knew that, if the set aside could be relocated, Shuff would plant beans on approximately 15 of the 55 acres he had leased to the plaintiffs. The plaintiffs' permission to relocate the set aside, which was never given, appeared to have been immaterial to the defendant as long as permission to relocate the set aside could be obtained from the ASCS office. On the basis of the evidence in the record, the trial court could well have deemed the defendant to be one who aided, abetted, assisted, or directed the commission of the trespass by Shuff upon the property leased by his other tenants, the plaintiffs. Hence, the trial court's finding of trespass was not against the manifest weight of the evidence and supported that part of the judgment entered in favor of the plaintiffs and against the defendant on both counts of their amended complaint.

We turn to the second issue raised by the defendant, that pertaining to the imposition of punitive damages. It has long been established in Illinois that punitive or exemplary damages may be awarded when torts are committed with fraud, actual malice, deliberate violence, or oppression, or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard of the rights of others. (*Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.) Where punitive damages may be assessed, they are allowed in the nature of punishment and as a warning and example to deter the defendant and others from committing like offenses in the future. (*Kelsay*, 74 Ill. 2d 172, 384 N.E.2d 353.) As a general rule, punitive damages are not recoverable for a breach of contract. (*Morrow v. L.A. Goldschmidt Associates, Inc.* (1986), 112 Ill. 2d 87, 492 N.E.2d 181.) However, an exception to the general rule that punitive damages are not recoverable for breach of contract exists when the conduct causing the breach is also a tort for which punitive damages are recoverable. (*Morrow*, 112 Ill. 2d 87, 492 N.E.2d 181.) That is to say, punitive damages are recoverable where the breach amounts to an independent tort and there are proper allegations of malice, wantonness, or oppression. (*Morrow*, 112 Ill. 2d 87, 492 N.E.2d 181.) While the measurement of punitive damages is a question for the trier of fact, the preliminary question of whether the facts of a particular case

justify the imposition of punitive damages is properly one of law. *Kelsay*, 74 Ill. 2d 172, 384 N.E.2d 353.

In making its ruling concerning the imposition of punitive damages, the trial court stated:

> "Now, we get to the issue of the punitive damages and I believe that the plaintiff has proved out a claim for punitive damages, and I am going to award punitive damages in the amount of $6,165.00. This is unusual in the sense that this type of case in that we are dealing with a share cropping arrangement. This is independent contractor situation. Normally, there can be no liability. The owner in this case of the land cannot be found liable for the actions of an independent contractor. However, here, we are dealing with somebody more than was usually the case. Here, we are dealing with 15 acres of land that had been rented, leased to the Freese's [*sic*] and the plaintiff here—strike that—the defendant knew the location of those 15 acres and the arrangements that he made with the independent contractor for the farming of that 15 acres required that the independent contractor go in and destroy that crop and based on the evidence I have here, Mr. Buoy knew that the Freese's [*sic*] were not likely to agree with the movement of that 15 acres voluntarily. It was the best land on the farm and armed with that knowledge and with the conversation that is on record that he had with Mr. Shuff, he basically—I think Mr. Shuff inferred that he had the okay to go in and destroy that crop and to plant beans in its place and Mr. Buoy did receive the benefits of that in that he did get half the bean crop."

■ At trial, as they do on review, the plaintiffs advanced a theory of agency, under which Charles Shuff acted as the defendant's agent. The trial court expressly found Charles Shuff to be an independent contractor. In their brief the plaintiffs assert that "[e]ven though it may be argued that Shuff worked for Buoy as an independent contractor, 'a person may be both an independent contractor and an agent for another.' *Hoffman & Morton Co. v. American Ins. Co.*, 35 Ill. App. 2d 97, 181 N.E.2d 821, 823 (1st Dist. 1962)." However, we think that whether Charles Shuff is considered to be the agent of the defendant in this regard—and we make no determination as to whether Charles Shuff was, in fact, the defendant's agent in these circumstances—the facts of the instant case do not, as a matter of law, justify the imposition of punitive damages.

■ ■ The initial question to be answered when punitive damages are sought is whether the facts and circumstances of the particu-

lar case justify their imposition. (*Varilek v. Mitchell Engineering Co.* (1990), 200 Ill. App. 3d 649, 558 N.E.2d 365.) Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded. (*Varilek*, 200 Ill. App. 3d 649, 558 N.E.2d 365.) With respect to the imposition of punitive damages in an action of trespass, our supreme court observed long ago in *Hawk v. Ridgway* (1864), 33 Ill. 473, 476:

> "In the action of trespass, the question of whether it was wantonly or willfully committed, is important to be considered in measuring the damages. Where the wrong is wanton, or it is willful, the jury are authorized to give an amount of damages beyond the actual injury sustained, as a punishment, and to preserve the public tranquillity. *Foot v. Nichols*, 28 Ill., 486. But when the wrongdoer acts in good faith, with honest intentions, and with prudence and proper caution, and he shall invade the rights of others so as to render himself liable to the action, preventive [punitive] or exemplary damages are improper. If no aggravating circumstances appear in the evidence, then vindictive damages should not be given."

In *Wetmore v. The Ladies of Loretto* (1966), 73 Ill. App. 2d 454, 220 N.E.2d 491, the court held that nominal damages should have been awarded to the counterplaintiff for the trespasses of the counterdefendant. The court in *Wetmore* found that the trespasses and actions of the counterdefendant were committed under a claim of right, albeit a mistaken one. Relying upon the principle that punitive damages are recoverable only where a wrongful act is accompanied by aggravating circumstances such as willfulness, wantonness, malice, or oppression, the *Wetmore* court concluded that under the circumstances it was not error for the trial court to find no malice and to refuse to award punitive damages. Similarly, in *Scott v. Bryson* (1874), 74 Ill. 420, the landlord sold corn his tenant claimed to have set apart as his own. In the action that followed for taking away the corn, the court found no basis in the testimony for the award of punitive damages. Having determined that there was a strong preponderance of evidence that the landlord had taken the corn in question "under a claim of right, made in good faith" (74 Ill. at 423), the court observed that "[u]nder such a state of the case it would be a perversion of the principle upon which the rule allowing punitive damages rests, to permit this verdict to stand" (74 Ill. at 423). Likewise, in *Gravett v. Mugge* (1878), 89 Ill. 218, the jury erroneously awarded damages in an action in trespass brought because the defendant had

taken and carried away lumber the plaintiff claimed belonged to him. The court in *Gravett* determined that to the extent the award consisted of exemplary damages it was "clearly wrong": "The lumber was taken by defendant in good faith, under the confident belief it all belonged to his principals, except a small quantity which was taken to save it from being washed away by the floods and lost, and if he was mistaken he ought only to be responsible in actual damages. There were strong grounds for the belief defendant had a legal right to take the lumber at any time as his own." 89 Ill. at 220.

The parties have cited us to and our research has disclosed no cases involving trespass arising out of a change in the location of acreage planted as part of a "set aside" program of the Federal government. In the absence of a case more nearly like the one at bar, we find *Hawk, Wetmore, Scott,* and *Gravett* instructive. In the instant case, the evidence is undisputed that, prior to relocating the set aside, Charles Shuff, in accord with the plan he and the defendant had agreed upon, requested and received permission from a Federal agency to relocate the plaintiffs' set aside. That permission was apparently given erroneously and would have been withheld had the agency known that the set aside acreage had already been planted. However, there is no evidence to suggest that either Charles Shuff or the defendant knew that set aside acreage, once planted, may not be relocated or that Charles Shuff in any way concealed the fact that the set aside acreage had already been planted or in any way misrepresented any information at all to personnel at the office of the Agriculture Stabilization Conservation Service. Having obtained the permission of the Federal agency to relocate the plaintiffs' set aside acreage, Charles Shuff planted as the plaintiffs' set aside a cover crop on approximately 15 acres of the property he himself leased from the defendant. For this acreage, planted by Charles Shuff, the plaintiffs received the same amount of money from the Federal government that they would have received had the set aside not been relocated. We think that under all of these circumstances, in the absence of aggravating circumstances, it was error for the trial court to award punitive damages. We note as well the observation of our supreme court in *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509, that the punitive and admonitory justifications for the imposition of punitive damages are sharply diminished in those cases in which liability is imposed vicariously. That part of the judgment awarding punitive damages in the amount of $6,165 is, accordingly, reversed.

■ Concerning the issue raised by the plaintiffs in their cross-appeal, the trial court in making the award of nominal damages stated as follows:

> "I find that the damages are nominal, speculative and not such that the Court can address any specific amount and as such, I am going to give judgment to the plaintiff in the amount of $1.00.
>
> With regard to compensatory damages, on the basis of that, I don't think by any stretch of the plaintiff's imagination, the plaintiff is entitled to $3,700. I also note that which the actions of the plaintiff [sic] were wrongful, that the plaintiffs did get the advantage of the set aside, did get some government payments and they accepted those payments. I believe that effected [sic] their damages and as has been evidenced by the argument today, the testimony received indicated that the use to which the plaintiffs could have put those oats were [sic] quite limited assuming that they intended and did in fact participate in the government set aside program. Therefore, the total amount of compensatory damages is $1.00 plus the costs."

Having reviewed the entire record, we cannot say that the trial court's award was against the manifest weight of the evidence. The evidence was greatly in conflict as to the height of the oats and the number of plants that were growing in the field when on approximately May 10, 1988, Charles Shuff removed them. The trial court could have believed on the basis of the evidence in the record that the condition of the oats when they were removed was not as robust as described by the plaintiffs and their neighbor William Cloe and that in a drought year, as was 1988, the value of such plants to the plaintiffs would ultimately have been negligible.

Affirmed in part; reversed in part.

HARRISON and HOWERTON, JJ., concur.