**Bernard LIVERS and Rhonda Livers, Plaintiffs,**

v.

**Ming Y WU, Ken Kuo, and Mogo, Inc., Defendants.**

No. 96 C 5333.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 30, 1998.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiff Bernard Livers and his wife Rhonda Livers bring this action again Mogo, Inc. ("Mogo"), the Bernard's former employer. Also named as defendants are Ming Wu ("Wu"), Mogo's president, and Ken Kuo ("Kuo"). All three defendants are fiduciaries of Mogo's pension plan. Count I is an Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, claim that defendants breached their duties as ERISA fiduciaries by converting to their own purposes funds that should have been deposited in Bernard's retirement plan. Count II is a claim against Mogo for breach of Bernard's written employment contract. Count III is a further claim against Mogo that its agents trespassed on plaintiffs' residence to seize a company car in Bernard's possession. Rhonda is a party only to Count III. Presently pending is defendants' motion for summary judgment and defendants' motion to disqualify plaintiffs' attorneys.

### I. FACTUAL BACKGROUND

On August 1, 1992, Bernard took up employment as national sales director for Mogo. The record is not exact regarding the nature and extent of Mogo's business, but it involves the sale of computer equipment. In 1996, Mogo had approximately 25 employees and, at all relevant times, Wu was not merely the president but also the principal, if not the sole, shareholder of the corporation. Bernard did not receive a written description of his duties but rather worked on matters by way of direct assignment from Wu. On December 23, 1992, Bernard and Mogo executed a written employment contract. The contract, which was drawn up on Mogo stationary and signed by Bernard and Wu contained the following terms:

We/I agree to the following for Bernard A. Livers,

I. Employment for a minimum of 4 years.

II. 15% of the net profit from Mogo Inc. to be paid on a Quarterly basis as long as under [sic] Bernard A. Livers is under Mogo Inc. employment.

III. If Mogo Inc. sells out with in 4 years, Bernard A. Livers will get a buy-out suitable to both parties.

IV. After 4 years if our client base has reached four thousand, Bernard A. Livers will be entitled to 5% ownership of Mogo Inc.

Bernard's starting salary was $20,000.00 per annum plus commissions, but, by the date of the employment contract, his salary had increased to $43,333.00 per annum. During the course of his employment, Bernard was paid additional sums in response to specific requests: an unspecified sum with respect to the purchase of a home, $7,000.00 relating to the payment of taxes and $1,000.00 to assist in the funding of a vacation.

Mogo's fortunes floundered over the next few years. It suffered a net loss every year, with the exception of 1994, when it had a net income of $60,013.00. Sometime in 1995, a decision was made to terminate the employment of a number of employees, including Bernard. On April 11, 1996, approximately eight months prior to the end of his four-year employment term, Bernard was discharged by Mogo.

At the time of his discharge, Bernard was earning an annual salary of $60,000.00. Mogo subsequently offered to reemploy him as an independent contractor, to be paid solely on a commission basis, but Bernard rejected the offer. As regards the other terms of the employment contract, the record does not establish facts that would trigger an entitlement to a buy-out or to a 5% interest in Mogo. Mogo did not sell out within the four year term and, additionally, Mogo's client base did not reach even half the number required to create the 5% interest for Bernard. However, it is clear that Mogo failed to provide Bernard with an accounting of net profits and losses in respect of any quarter. While Mogo concedes that it did have a net profit of $60,013.00 in 1994, it does not dispute that it failed to pay Bernard any sum as a percentage of net profit. Mogo also failed to reimburse Bernard $505.28 in respect of a business trip to Arizona which he undertook on behalf of Mogo.

At all times relevant to this lawsuit, Mogo operated a 401(k) salary retirement plan ("the Plan") which constituted an ERISA plan, as defined by 29 U.S.C. § 1002(2)(A). Wu, Kuo, and Mogo acted as fiduciaries of the Plan. Bernard participated in the Plan and, at his direction, from July 14, 1995 until April 15, 1996, Mogo withheld $250 from his salary for each twice-monthly pay period for contribution to the Plan. However, by April 15, 1996, the date of his last salary payment, deferred compensation in respect of the preceding nine months had not been deposited with the Plan trustee on his behalf. Only $2,500 of a total of $4,750 deferred compensation had been so deposited. The outstanding sum of $2,250 was subsequently deposited in two installments: $1,500 on June 12, 1996 and $750 on November 27, 1996. Defendants contend that additional sums were also deposited representing the amount of employer matching contributions as well as an amount equal to the income which the deferred and matching contributions would have earned had they been deposited with the trustee on the last day of the calendar month in which compensation was withheld.

After his separation from Mogo, Bernard remained in possession of his company car, which was owned by Mogo. Bernard offered to return the car, but only upon payment by Mogo of all sums he considered owing to him. On June 28, 1996, an agent of Mogo came to the Livers residence and removed the vehicle. When the garage door was left open momentarily, he entered the vehicle with the aid of a key, backed it out of the garage and drove off. The repossession took place in plain view of Rhonda and her son and over Rhonda's screamed objections. Bernard was inside the house at the time the vehicle was removed. Rhonda's son was upset by the incident. Rhonda herself began to shake and cry uncontrollably and felt emotionally overwhelmed all that day and that night. However, she did not seek or receive any medical attention at the time. Approximately nine months later, she consulted a doctor who diagnosed her as suffering from depression.

Rhonda says that she continues to endure repercussions from the incident involving the removal of the vehicle.

## II. MOTION TO DISQUALIFY

▮] Defendants move to disqualify C.D. Kasson and the law firm of Burditt and Radzius as attorneys for plaintiffs. Defendants contend that Kasson and his firm formerly represented Mogo in a matter substantially related to their representation of plaintiffs in the present case.

The basis for defendants' motion is that Kasson and his firm formerly represented Mogo in a civil action that arose out of a transaction between Mogo and a Kentucky corporation, William L. Sanders, D.M.D., P.S.C. The transaction, which involved the sale of certain computer equipment by Mogo, was negotiated by Bernard, acting on Mogo's behalf. In March 1995, Sanders filed suit against Mogo seeking damages for breach of contract on the ground that the equipment was not capable of the performance promised by Mogo. There is no indication that Mogo directly hired the services of Kasson and his firm at any relevant time in connection with the Sanders lawsuit. Rather, defendants contend that an implied representation arose indirectly by virtue of Kasson's representation of Bernard. The events giving rise to the alleged representation are related in a fax dated June 25, 1997, sent by Kasson to Raymond Rossi ("Rossi"), defendants' lawyer in the present case. In the fax, Kasson states that Sanders' attorneys have been endeavoring to take Bernard's deposition in connection with that lawsuit and that he plans to refer the matter to Rossi's offices unless advised otherwise. He indicates that his firm has had several communications with Sanders' attorneys regarding coordination of the taking of depositions and has invoiced Bernard $400.00 in respect of time spent on the file. Kasson closes by stating that his firm will appreciate a payment by Mogo. *See* Exhibit H to Def. Mem.

Disqualification is a drastic measure that the courts should impose only when absolutely necessary. *Owen v. Wangerin,* 985 F.2d 312, 317 (7th Cir.1993); *Weeks v. Samsung Heavy Industries Co.,* 909 F.Supp. 582, 583 (N.D.Ill.1996). The movant has the burden of establishing facts requiring disqualification. *Id.* In determining whether disqualification is proper, the court applies the Rules of Professional Conduct of the Northern District of Illinois. Rule 1.9 addresses conflicts of interest involving former clients and provides in relevant part:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which the person's interests are materially adverse to the interests of the former client unless the former client consents after disclosure.

*See GTE North, Inc. v. Apache Products Co.,* 914 F.Supp. 1575, 1579 (N.D.Ill.1996). Rule 1.10 disqualifies an entire law firm where a member of that firm is prohibited from representing the new client under Rule 1.9. Both rules operate to enforce the basic prohibition against an attorney using a client's confidential information against that client and on behalf of another client. *See* Rule 1.6; *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1266 (7th Cir.1983).

In addressing disqualification questions, a district court must initially make a factual reconstruction of the scope of the prior legal representation. *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 225 (7th Cir. 1978). Ordinarily, the proper method is for the court to conduct an evidentiary hearing or review evidence submitted in the form of affidavits. *GTE North,* 914 F.Supp. at 1581. However, neither party has requested an evidentiary hearing nor submitted affidavits. Defendants, as movants, have the burden of showing that Kasson and his firm had access to confidential or privileged information during the course of a prior representation. *Weeks,* 909 F.Supp. at 583; *Hoban v. Strata Marketing, Inc.,* 1991 WL 204965 *1 (N.D.Ill. Oct.2, 1991).

Defendants contend that Kasson and his firm performed legal services for Mogo while the present lawsuit was pending and that Kasson believes that his firm is entitled to payment by Mogo. Defendants contend further that the former representation was substantially related to the present representation of Bernard and Rhonda. This sub-

stantial relationship, defendants say, gives rise to a presumption that confidential information is exchanged and shared freely among the individuals of the law firm in question. Plaintiffs respond that there is no evidence that Kasson and his firm ever acted for Mogo in any capacity and they dispute the existence in defendants' motion of any factual allegation of actual or implied representation. Plaintiffs contend that the fact that Bernard is suing Mogo and seeks a sharing of his costs does not create an attorney-client relationship between Bernard's attorney and defendants. Finally, plaintiffs contend that, absent a direct attorney-client relationship, there is no presumption that confidential information was exchanged.

The standard for disqualification is the substantial relationship test: a lawyer may not represent an adversary of his former client if the subject matter of the two representations is substantially related. *Analytica,* 708 F.2d at 1266; *LaSalle National Bank v. County of Lake,* 703 F.2d 252, 255 (7th Cir.1983). But this test assumes the existence of a prior attorney-client relationship. Thus, the threshold question to be determined here is whether an attorney-client relationship existed between Kasson and Mogo. In the normal course of events, such a relationship is based upon a formal arrangement between the attorney and the client. But even absent a formal arrangement, there are circumstances in which a relationship will be implied and the attorney found to owe fiduciary obligations to the layperson. *Westinghouse Electric,* 580 F.2d at 1319. Similarly, a professional relationship is not dependent upon the payment of fees. *Id.* at 1317. In order to establish an implied attorney-client relationship, it must be shown that the client believed that he or she was represented by the attorney. In other words, the privilege of attorney-client communications arises only when the client has manifest an intention to seek legal advice or consult with the attorney in that capacity. *Westinghouse Electric,* 580 F.2d at 1319; *International Paper Co. v. Lloyd Manufacturing Co.,* 555 F.Supp. 125, 131 (N.D.Ill.1982).

In the present case, there is no evidence that Mogo believed that Kasson represented Mogo with regard to the Sanders lawsuit. On the contrary, defendants infer from Kasson's fax a belief on the part of Kasson that he represented Mogo in the matter. Plaintiffs dispute this inference, contending that Kasson merely sought the recovery from Mogo of legal costs which had been invoiced to his client, Bernard. In any event, whether an attorney-client relationship existed hinges upon Mogo's, rather than Kasson's, understanding of the situation and the facts presented suggest that Mogo did not believe that it had any form of professional relationship with Kasson or any member of his firm. At no point did Mogo communicate directly with Kasson, much less consult with him with a view to obtaining legal advice. Mogo had no need of Kasson's services with respect to the Sanders lawsuit and, to the extent that Kasson communicated with Sanders' attorneys, he did so on behalf of Bernard. These communications were due solely to the fact that Bernard, Kasson's client, was a witness in the Sanders lawsuit. Kasson states in his fax to Rossi that he plans to refer the matter to Rossi's offices, acknowledging that it relates to Mogo's business.

Whether it was necessary or, indeed, prudent for Kasson to communicate with Sanders' attorneys in the circumstances is not clear and the parties have not furnished facts that would assist in reaching this determination. However, the issue is not crucial to a decision on the motion to disqualify. The central concern raised by this motion is whether Kasson received confidential information from Mogo that he can now use against Mogo on Bernard's behalf. Defendants have failed to show that any confidential information was exchanged between Mogo and Kasson or, indeed, that any opportunity arose for the exchange of such information.

Since defendants have not established the existence of an attorney-client relationship, there is no need to reach the question of whether there is a substantial relationship between the Sanders lawsuit and the present lawsuit. Accordingly, defendants' motion to disqualify will be denied.

## III. MOTION FOR SUMMARY JUDGMENT

### Standard of Review

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Valance v. Wisel,* 110 F.3d 1269, 1274 (7th Cir.1997); *Patel v. Allstate Insurance Co.,* 105 F.3d 365, 367 (7th Cir.1997). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Essex v. United Parcel Service, Inc.,* 111 F.3d 1304, 1308 (7th Cir. 1997). The nonmovant, however, must make a showing sufficient to establish any essential element for which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir.1997). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476–77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988). As the Seventh Circuit has summarized:

> The moving party bears the initial burden of directing the district court to the determinative issues and the available evidence that pertains to each. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *id.* at 325, 106 S.Ct. 2548 ("the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case"). Then, with respect to issues that the non-moving party will bear the burden of proving at trial, the non-moving party must come forward with affidavits, depositions, answers to interrogatories or admissions and designate specific facts which establish that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The non-moving party cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue. *Id.* The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir. 1992).

In the present case, among the documents filed in support of defendants' motion for summary judgment was a statement of material uncontested facts as required by Local Rule 12(M). Plaintiffs filed a memorandum of law but failed to submit a statement of material facts in support of their response to defendants' motion in accordance with Rule 12(N).[1] Aside from one six-page extract

---

1. Rule 12(N) requires the nonmovant to serve and file a response to the movant's statement as well as a statement of any additional facts that require denial of summary judgment, making specific reference to affidavits, parts of the rec-

ord, and other supporting materials relied upon. The Rule provides that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted unless con-

from the deposition of Livers, plaintiffs have attached no affidavits or other evidence in support of their response.

■ When a nonmovant fails to file a Rule 12(N) statement, the district court may properly treat that party's failure to contest the moving party's Rule 12(M) statement of uncontested facts as a binding admission of those facts. *Smith v. Severn*, 129 F.3d 419, 425 (7th Cir.1997); *Midwest Imports Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir.1995). This is a departure from the usual posture of construing all facts in favor of the moving party. *Johnson v. Gudmundsson*, 35 F.3d 1104, 1108 (7th Cir.1994). The manner of evaluating the facts does not change, but any facts contradicting the Rule 12(M) statement are not properly before the court. The Rule 12(M) statement and all reasonable inferences drawn therefrom are still viewed in the light most favorable to the nonmovant. *Smith*, 129 F.3d at 425–26.

It follows that, in the present case, to the extent that plaintiffs have failed to controvert the facts asserted by defendants and supported by affidavits and other exhibit evidence, those facts must be taken as true.

*Count I: ERISA*

The Count I ERISA claim is based on defendants' failure to deposit the requisite contributions with the Plan trustee in a timely fashion. It alleges that one or more of defendants withheld for their own benefit the $2,250 which should have been deposited on Bernard's behalf. Bernard complains that Mogo, Wu and Kuo breached their duties as ERISA fiduciaries and engaged in transactions prohibited by the statute. He seeks wide-ranging relief: full payment of all contributions owing for the benefit of Bernard and any other employee similarly situated, together with prejudgment interest pursuant to 29 U.S.C. § 1132(a)(1)(B); appropriate relief, including damages for defendants' violations of the terms of the Plan and of 29 U.S.C. § 1106(a) and (b); equitable relief pursuant to 29 U.S.C. § 1132(a)(3); punitive damages; and costs and attorneys fees pursuant to 29 U.S.C. § 1132(g).

Defendants respond that since all of the amounts that had been withheld from employee compensation have been deposited in the trust, Bernard has received full payment of all contributions owing to him. They contend that Bernard is not entitled to the additional relief sought. They say that he cannot recover damages or other relief for alleged violations of the Plan because no Plan provision has been violated. Additionally, defendants contend that ERISA does not make provision for prejudgment interest, nor provide for the possibility of punitive damages in a case such as this. Finally, defendants contend that it would not be reasonable to award Bernard attorneys fees and costs.

■ ERISA was enacted in part to protect the "interests of participants in employee benefit plans ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." 29 U.S.C. § 1001(b). The Supreme Court has stated that the statutory provisions relating to fiduciary duties should be interpreted bearing in mind their common law origins and the nature and purpose of the statute. *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 1072–73, 134 L.Ed.2d 130 (1996). An ERISA fiduciary is obliged to discharge his or her duties with respect to a plan for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable plan administration expenses. 29 U.S.C. § 1104(1)(A). The statute expressly provides that, subject to certain narrow exceptions, "the assets of a plan shall never inure to the benefit of any employer" but shall be held for these exclusive purposes. 29 U.S.C. § 1103(c)(1). Additionally, a fiduciary must act with the care, skill, prudence and diligence that a prudent person would exercise in the circumstances. 29 U.S.C. § 1104(1)(B).

The assets of a plan include amounts that an employer withholds from the salary of a participant for contribution to the plan. 29 C.F.R. § 2510.3–102(a) and (b)(1); *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 223 (1991). Failure to make the required contributions in a timely

troverted by the statement of the opposing par- ty."

fashion constitutes a breach of fiduciary duties. *Grottkau v. Sky Climber, Inc.,* 1995 WL 32611 *13 (N.D.Ill. Jan.26, 1995). Additionally, ERISA prohibits the use of plan assets to finance transactions between the plan and a party in interest or a fiduciary. 29 U.S.C. § 1106(a) and (b); *Leigh v. Engle,* 727 F.2d 113, 126–27 (7th Cir.1984).

The undisputed facts establish that ERISA applies to Mogo's retirement Plan, that Bernard was a participant in the Plan and that Wu, Kuo and Mogo were Plan fiduciaries. From July 1, 1995 to April 15, 1996, defendants failed to timely deposit Bernard's contributions to the plan. The total deferred compensation that was withheld during this nine-month period was $4,750. Defendants do not refute the specific claim that they failed to deposit the contributions in a timely manner. Nor do they respond to Bernard's contention that they violated the statute by breaching their fiduciary duties and engaging in prohibited transactions.[2] Instead, defendants have moved for summary judgment on Count I on the ground that Bernard is not entitled to the wide-ranging relief which he seeks: full payment of all required contributions, prejudgment interest, compensatory and punitive damages, individualized equitable relief and costs and attorneys fees. Accordingly, the only issue to be determined is whether Bernard is entitled to such relief.

■ A participant in an ERISA plan has standing to bring a civil action to enjoin violations of the statute or the terms of the plan or obtain "other appropriate equitable relief" to redress such violations or enforce the provisions of the statute and plan. 29 U.S.C. § 1132(a)(3). In *Varity,* the Supreme Court confirmed that this subsection authorizes suits for individual relief for breaches of fiduciary duties. 116 S.Ct. at 1076–78. However, the subsection does not authorize equitable relief at large but only appropriate

equitable relief for the purpose of redressing any violations or enforcing any provisions of ERISA or of an ERISA plan. *Peacock v. Thomas,* 516 U.S. 349, 116 S.Ct. 862, 866, 133 L.Ed.2d 817 (1996); *Mertens v. Hewitt Associates,* 508 U.S. 248, 253, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). The Supreme Court has also held that compensatory and punitive damages are not equitable relief within the meaning of the subsection. *Mertens v. Hewitt Associates,* 508 U.S. at 255–58, 113 S.Ct. 2063. ERISA expressly provides that a fiduciary shall be personally liable to the plan for damages and restitution of profits gained through a breach of his or her duties. 29 U.S.C. § 1109(a).[3] Case law confirms that this right to recover damages for breach of fiduciary duties lies not with an individual beneficiary but with the plan itself. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 141–42, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985).

■ ERISA provides that the court may, in its discretion, award reasonable attorneys fees to either party. 29 U.S.C. § 1132(g). The Seventh Circuit has recognized that this provision is not in the nature of a punitive damage award but rather is analogous to an assessment of costs under Fed.R.Civ.P. 54(d). *Rivera v. Benefit Trust Life Ins. Co.,* 921 F.2d 692, 697 (7th Cir. 1991); *Bittner v. Sadoff & Rudoy Industries,* 728 F.2d 820, 828 (7th Cir.1984). Although the statute is silent regarding prejudgment interest, case law establishes that an award of prejudgment interest is also within the discretion of the court in an ERISA case. *Rivera,* 921 F.2d at 696; *Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.,* 896 F.2d 228 (7th Cir.1990).

Bernard's principal claim for relief is full restitution of all monies owed to the Plan on his behalf. The record shows that in the months following his discharge from Mogo's

---

**2.** Defendants dispute Bernard's claim that defendants have breached the terms of the Plan. But, in any event, Bernard has failed to substantiate this claim by referring to or reciting any specific term of the Plan or by presenting a copy of the Plan. Defendants also contest the allegation that they misrepresented to Bernard that the necessary contributions had in fact been deposited in the Plan. They present Wu's affidavit to the effect

that he advised Bernard on numerous occasions that deferred compensation would be paid to the Plan as soon as practicable. *See* Exhibit D to Def. Mem.

**3.** Additionally, pursuant to 29 U.S.C. § 1132(*l*), the Secretary may assess a civil penalty against a fiduciary for breach of his or her duties.

employ, defendants deposited the delinquent salary contributions with the Plan trustees. The bulk of the outstanding sums were deposited before the initiation of this lawsuit. As of April 15, 1996, Mogo had deposited $2,500 of Bernard's deferred compensation and a further $1,500 was deposited on June 12, 1996. However, the final $750 was not deposited until November 27, 1996. Also deposited with the deferred income were the matching employer contributions. Accordingly, at the present time, the claims for full payment of all required contributions have been satisfied.

■ Similarly, defendants have deposited sums representing the interest that the salary and employer contributions would have earned. The interest paid was calculated as an amount equal to the income which the deferred compensation and matching contributions would have earned had these amounts been deposited in the Plan on the last day of the calendar month in which compensation was withheld. In responding to defendants' motion for summary judgment, Bernard merely states that he is entitled to prejudgment interest. He does not take issue with defendants' contention that sums representing the interest owed have in fact been paid into the Plan nor does he object to defendants' method of computing the interest owed. Since Bernard has failed to controvert the facts presented by defendants, it may be assumed that the interest owed has in fact been deposited and that the amount of such interest is adequate. It follows that Bernard's claim to prejudgment interest has been satisfied.

■ Bernard also seeks "individualized equitable relief" in accordance with 29 U.S.C. § 1132(a)(3). Contrary to his contentions, he is not entitled to recover compensatory or punitive damages under this or any other subsection. Although Bernard refers to relief for all participants in the Plan, the amended complaint is not denominated as a class action. Since Bernard brings this action as an individual claimant, the potential remedies available to him are necessarily limited to the equitable relief contemplated by 29 U.S.C. § 1132(a)(3). Specifically, such relief does not extend to compensatory or punitive damages. *Mertens*, 508 U.S. at 255, 113 S.Ct. 2063; *Russell*, 473 U.S. at 148, 105 S.Ct. 3085.

Bernard does not respond to defendants' contention that Bernard is not entitled to compensatory damages. However, he does cite four cases in support of the proposition that punitive damages are available under ERISA: *Reeves v. Continental Equities Corp.*, 767 F.Supp. 469 (S.D.N.Y.1991); *Cox v. Eichler*, 765 F.Supp. 601 (N.D.Cal.1990); *James A. Dooley Associates Employees Retirement Plan v. Reynolds*, 654 F.Supp. 457 (E.D.Mo.1987); *Gilliken v. Hughes*, 609 F.Supp. 178 (D.Del.1985). Each of these cases preceded the Supreme Court's holding in *Mertens* to the effect that compensatory and punitive damages are not equitable relief within the meaning of 29 U.S.C. § 1132(a)(3). To the extent that these cases recognize the possibility of individual claims for punitive damages, they are no longer reliable authority. Indeed, the holdings in *Reeves* and *Cox* were expressly premised on the fact that, at the time, the Supreme Court had not ruled on the availability of punitive damages under ERISA. *Reeves*, 767 F.Supp. at 474; *Cox*, 765 F.Supp. at 610.[4]

Aside from his request for damages, Bernard fails to specify the form of any "individualized equitable relief" pursuant to 29 U.S.C. § 1132(a)(3) to which he may be entitled. Since the burden is on Bernard to show that he is entitled to a particular form of relief under the subsection, he has failed to present a triable issue in this regard.

■ Finally, Bernard seeks costs and attorneys fees pursuant to 29 U.S.C. § 1132(g). The decision whether to award reasonable fees and costs is a matter for the discretion

---

4. Additionally, these cases do not stand for the proposition which Bernard seeks to assert. In contrast to the present case, the claims in *Cox* and *Dooley* were brought not by an individual claimant but by the Plan itself. Moreover, *Dooley* and *Gilliken* are distinguishable in that both cases involved wilful and malicious breaches of fiduciary duties. Finally, in *Reeves*, the court merely left open the question of punitive damages on the ground that it was unclear whether they were available on an ERISA claim.

of the court. The record shows not merely that defendants delayed several months in depositing the required contributions but also that the required amounts were not paid in full until after the present lawsuit was initiated. To the extent that Bernard can show that this lawsuit was necessitated by defendants' failure to pay delinquent contributions, he may be entitled to such costs and fees. However, this is not a matter that must be addressed in the context of the present motion for summary judgment. *Rivera,* 921 F.2d at 697; *Bittner,* 728 F.2d at 828. A request for costs and attorneys fees may be made by motion in compliance with Local Rules 45, 46 and 47 subsequent to the resolution of this lawsuit.

In summary, with the exception of his claim for costs and attorneys fees, Bernard has failed to present a triable issue of fact as to his entitlement to any relief under the terms of the statute. His claims to full payment of all required contributions and to prejudgment interest are now moot. Since Bernard would bear the burden of proof at trial as to his entitlement to any other form of relief, the burden was on him to provide proof in response to the summary judgment motion. Accordingly, the motion for summary judgment will be granted in respect to Count I.

*Counts II and III: Diversity Jurisdiction*

Plaintiffs assert two alternative bases for jurisdiction over the state law claims contained in Counts II and III: supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and diversity jurisdiction pursuant to 28 U.S.C. § 1332. Since the Count I ERISA claim will be dismissed, no supplemental jurisdiction exists in respect of the state law claims contained in Counts II and III. Defendants contend that there is no diversity jurisdiction either with the result that the entire action must be dismissed. They dispute plaintiffs' claim that complete diversity of citizenship exists and that the matter in controversy exceeds the requisite jurisdictional amount of $50,000.00.

For a case to be within the diversity jurisdiction of the federal courts, there must be complete diversity of citizenship, meaning that no plaintiff may be a citizen of the same state as any defendant. *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806); *Fidelity & Deposit Co. of Maryland v. Sheboygan Falls,* 713 F.2d 1261, 1264 (7th Cir.1983). The relevant inquiry is the citizenship of the parties at the time when suit is filed. *Moore v. Ashland Oil, Inc.,* 901 F.2d 1445, 1448 (7th Cir.1990). Under federal common law, a person is a citizen of the State in which he or she is domiciled and is domiciled in the State in which he or she is physically present with the intention of remaining indefinitely. In other words, a person is a citizen of the State which he or she makes his or her permanent home. *Galva Foundry Co. v. Heiden,* 924 F.2d 729, 730 (7th Cir.1991); *Sadat v. Mertes,* 615 F.2d 1176, 1180 (7th Cir.1980); *Seaboard Finance Co. v. Davis,* 276 F.Supp. 507, 509 (N.D.Ill. 1967).

The record shows that plaintiffs moved to Illinois from Kentucky in 1992 so that Bernard could take up employment with Mogo. Following his discharge from Mogo, the family left Illinois in August 1996 and moved to Alabama. Again, the stated purpose of the move was so that Bernard could take up a job with a new employer. Rhonda testified that two-to-three months prior to their departure for Alabama, plaintiffs placed their residence in Illinois on the market. Mogo is the sole defendant in respect to Counts II and III. It is undisputed that on August 23, 1996, the date when the complaint was filed, Mogo was incorporated and had its principal place of business in Illinois. Plaintiffs say that diversity exists because both Bernard and Rhonda were citizens of Alabama at that time. However, defendants infer from the fact that plaintiffs did not execute a lease for their Alabama residence until September 6, 1996, that plaintiffs were still citizens of Illinois at the time of the filing of the complaint.

The essence of defendants' argument is that plaintiffs did not become Alabama citizens until such time as they executed a residential lease in that state. Yet defendants offer no authority in support of the proposition that the signing of a residential lease is determinative of citizenship. Certainly, there is nothing unusual or sinister in the fact that a number of weeks elapsed between

the time of plaintiffs' arrival in Alabama and their signing of the lease. At best, the signing of the lease is a factor that the court may take into account. But, the totality of the evidence suggests that, at the time the suit was filed, plaintiffs were not merely physically present in Alabama but had made Alabama their home and intended to remain there indefinitely. Accordingly, the action will not be dismissed for lack of diversity.

 Defendants also dispute plaintiffs' contention that the amount in controversy exceeds $50,000.00. When a jurisdictional amount is required, the plaintiff must properly allege the amount in controversy. A plaintiff's good faith evaluation of the stakes controls unless it appears to a legal certainty that the claim is really for less than the jurisdictional amount. *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 82 L.Ed. 845 (1938); *The Barbers, Hairstyling for Men & Women, Inc. v. Bishop*, 132 F.3d 1203, 1205 (7th Cir.1997). When the amount in controversy is contested, a plaintiff must support his or her assertion with competent proof, *i.e.*, proof to a reasonable probability that jurisdiction exists. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir.1995); *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 237 (7th Cir.), *cert. denied*, 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995).

██ In the present case, the stakes almost certainly exceed the jurisdictional amount in respect of each state law claim brought by each plaintiff. In Count II, Bernard claims various forms of monetary relief for breach of contract: payment of his salary for the remaining eight months of his four year term, reimbursement of $505.28 work-related expenses, 15% of net profits, and damages for the loss of his buy-out opportunity and his 5% interest in Mogo. If Bernard were to succeed in his claim, the payment of outstanding salary alone could come to $40,-000. It is reasonable to assume that the 15% of net profits, the buy-out opportunity, and the 5% interest in Mogo, had a value to

Bernard in excess of the approximately $9,500.00 required to bring the claim over the threshold of $50,000.00. Even if there were some doubt as to the sufficiency of his contract claim, Bernard could aggregate this claim and his Count III trespass claim against Mogo to satisfy the jurisdictional amount requirement.[5] In respect of the trespass claim, Bernard and Rhonda each seek compensatory and punitive damages for emotional distress resulting from Mogo's alleged trespass. A claim for damages in excess of $50,000.00 would appear to be a good faith representation of the direct pecuniary value of the rights that each plaintiff seeks to enforce. Illinois law recognizes the propriety of awarding damages in trespass cases and damages for emotional distress.

Accordingly, there is no basis on which it might be found to a legal certainty that any of the state law claims contained in Counts II and III do not independently exceed the requisite amount. The action will not be dismissed for failure to properly allege the amount in controversy for the purposes of establishing diversity jurisdiction.

*Count II: Breach of Contract*

Count II is a state law claim against defendant Mogo for breach of Bernard's employment contract. It is alleged that Mogo discharged Bernard approximately seven months before the end of the four-year term and failed to furnish him with his salary and employment benefits after April 15, 1996. It is further alleged that Mogo failed to pay Bernard 15% of net profits on a quarterly basis and failed to provide him with an accounting of such profits. Finally, Bernard contends that Mogo failed to reimburse expenses amounting to $505.28 in connection with a business trip to Arizona. Bernard seeks payment of his salary for the remaining seven months of his four-year term, reimbursement of expenses, payment of 15% of net profits, and other appropriate relief.

As noted above, no issue arises with respect to the remaining terms of the contract. Bernard complains that he has never re-

---

**5.** Bernard's and Rhonda's respective trespass claims may not be aggregated since they do not arise out of a common, undivided interest. *Anthony v. Security Pacific Financial Servs., Inc.*, 75 F.3d 311, 315 (7th Cir.1996). *See* 14A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3704 at 71–80 (2d ed.1985). ·

ceived any information regarding Mogo's client base as it relates to his 5% ownership interest in Mogo. He also complains that by virtue of his wrongful discharge Mogo has deprived him of his opportunity to negotiate a buy-out in the event that Mogo sold out within the contract term. However, there has been no sale of Mogo that would activate Bernard's buy-out opportunity, and Mogo's client base has not reached even half of the 4,000 threshold that would entitle Bernard to a 5% ownership.

■ Mogo does not dispute that the contract exists or that it establishes certain entitlements in Bernard's favor. Its principal response is that by virtue of salary increases and bonuses Bernard has actually been paid more than he is entitled to under the contract. As regards Bernard's entitlement to 15% of net profits, Mogo points out that it suffered a net loss during the period of Bernard's employment. Finally, Mogo contends that Bernard was offered continued employment with Mogo but that he rejected the offer.

An employment contract, express or implied, is essential to the employer-employee relationship. *A. J. Johnson Paving Co. v. Industrial Commission*, 82 Ill.2d 341, 45 Ill. Dec. 126, 412 N.E.2d 477, 481 (1980). Such a contract is formed when one party promises to render services in exchange for the other party's promise to pay wages. *DeHeer–Liss v. Friedman*, 227 Ill.App.3d 422, 169 Ill.Dec. 526, 592 N.E.2d 13, 16 (1991); *Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 90 Ill.Dec. 558, 482 N.E.2d 377, 381 (1985). When the contract of employment is stated to be for a definite period, it terminates by its own terms at the end of such period and may not be terminated at an earlier time except by mutual agreement, unless the right to do so is reserved in the contract. *See* 27 Am.Jur.2d *Employment Relationship* § 30 (1996).

■ A wrongfully discharged employee must act to mitigate damages by seeking similar employment; damages will be reduced by sums he or she earned or could have earned through reasonable diligence in seeking employment. *Gaiser v. Village of Skokie*, 271 Ill.App.3d 85, 207 Ill.Dec. 749,

648 N.E.2d 205, 213 (1995); *Foster v. Springfield Clinic*, 88 Ill.App.3d 459, 43 Ill.Dec. 604, 410 N.E.2d 604, 609 (1980). However, a discharged employee need not accept an offer of reemployment by the employer when to do so would constitute a disadvantageous renegotiation of his or her original contract or an abandonment of rights and remedies arising thereunder. *Schwarze v. Solo Cup Co.*, 112 Ill.App.3d 632, 68 Ill.Dec. 228, 445 N.E.2d 872, 876 (1983); *Claeson v. Hennessey*, 20 Ill.App.2d 437, 156 N.E.2d 234, 238 (1959).

In an action for breach of contract, the plaintiff shoulders the burden of establishing every material term of the contract. *DeHeer–Liss*, 169 Ill.Dec. 526, 592 N.E.2d at 17; *Vandevier*, 90 Ill.Dec. 558, 482 N.E.2d at 380. A court's objective when enforcing a contract is to ascertain and effectuate the parties' intent. *Dow v. Columbus–Cabrini Medical Center*, 274 Ill.App.3d 653, 211 Ill.Dec. 341, 655 N.E.2d 1, 3 (1995); *Susmano v. Associated Internists of Chicago Ltd.*, 97 Ill.App.3d 215, 52 Ill.Dec. 670, 422 N.E.2d 879, 882 (1981). When the terms of a contract are clear and unambiguous, they will be given their natural and ordinary meaning. Whether the contract is clear or ambiguous is to be determined by the court as a matter of law. *Groshek v. Frainey*, 274 Ill.App.3d 566, 211 Ill.Dec. 5, 654 N.E.2d 467, 470 (1995); *Susmano*, 52 Ill.Dec. 670, 422 N.E.2d at 882. A contract is ambiguous if it is reasonably or fairly susceptible to different constructions but contractual language is not rendered ambiguous just because the parties do not agree on its meaning. *Frydman v. Horn Eye Center, Ltd.*, 286 Ill.App.3d 853, 222 Ill.Dec. 151, 676 N.E.2d 1355, 1359 (1997); *Continental Mobile Telephone Co. v. Chicago SMSA Ltd. Partnership*, 225 Ill.App.3d 317, 167 Ill.Dec. 554, 587 N.E.2d 1169, 1173 (1992); *Berutti v. Dierks Foods, Inc.*, 145 Ill.App.3d 931, 99 Ill.Dec. 775, 496 N.E.2d 350, 352 (1986). As a general rule, the parties' intent must be gleaned from the terms of the contract but if the contract provides no unambiguous answer, the court may look to extrinsic evidence. *Freeman v. Liu*, 112 F.R.D. 35, 37 (N.D.Ill.1986); *Titchener v. Avery Coonley*

*School,* 39 Ill.App.3d 871, 350 N.E.2d 502, 506 (1976).

In the present case, the record shows that Bernard was employed under a fixed term contract of employment with Mogo and that Mogo unilaterally breached the contract by discharging him prior to the expiration of the term. Mogo contends that Bernard was offered and rejected what Mogo refers to as "continued employment." *See* Def.Mem. at 6. However, since Mogo's offer was made several weeks after Bernard's wrongful discharge, it can hardly be described as an offer of continued employment. Moreover, the substance of the offer was not to employ Bernard but rather to retain his services as an independent contractor, on terms entirely distinct from his previous employment. In Mogo's own words, Bernard would no longer be national sales director but "a commissioned salesman." Accordingly, Mogo cannot rely on this offer either to deny that Bernard was actually discharged or to contend that he failed to mitigate his damages by accepting the offer. *Schwarze,* 68 Ill.Dec. 228, 445 N.E.2d at 877 (it would be inequitable to allow an employer to breach the employment agreement and then cut off its own liability by offering employment not contemplated by the agreement, thus forcing the employee to renegotiate the agreement to his or her own disadvantage or be precluded from seeking damages).

Mogo seeks summary judgment on Count II principally on the ground that Bernard has already received more than he bargained for under the contract and is not entitled to any further relief. Mogo contends that the first clause of the contract entitles Bernard to four years employment at the rate of salary which Bernard earned at the time of the signing of the contract, namely $43,-333.00. Mogo estimates that, at most, Bernard was entitled to be paid $173,332.64 when he was in fact paid a total of $189,-124.80 in salary and bonus payments. Bernard responds by disputing in general terms Mogo's assertions of monies earned and paid although he fails to offer any specific evidence to controvert the figures and computations presented. Nevertheless, Bernard contends that there are issues of material fact as

to the meaning of the terms of the contract and as to Mogo's performance thereunder which preclude summary judgment for defendant Mogo on Count II.

The plain language of the contract guarantees Bernard a four-year term of employment. But the contract is silent as to amount of salary and compensation Bernard is to be paid during that term. Mogo concludes that Bernard is entitled to four years salary fixed at his rate of earnings on December 23, 1992, the date of the signing of the contract. But Mogo presents no evidence to confirm that this was the understanding of the parties. As a general rule, an agreement which has been reduced to writing is presumed to represent the intentions of the parties and may not be changed by extrinsic evidence. *Magnus v. Lutheran General Health Care System,* 235 Ill.App.3d 173, 176 Ill.Dec. 209, 601 N.E.2d 907, 913 (1992); *Titchener,* 350 N.E.2d at 506. In the present case, however, it is clear that the brief four-clause contract does not reflect the entire understanding of the parties regarding their employment relationship. Putting aside the issue of salary, the contract makes no mention of Bernard's job title or description. Nor does it make provision or incorporate by reference terms relating to the many and varied aspects of the employment relationship that are routinely included in employment contracts. It is clear that many issues, including the issue of the rate of Bernard's salary, were the subject of separate agreement between the parties and are not an integrated part of the written contract. *USX Corp. v. Liberty Mutual Ins. Co.,* 269 Ill. App.3d 233, 206 Ill.Dec. 391, 645 N.E.2d 396, 398 (1994). Absent evidence of the parties' express agreement on the issue, Mogo cannot rely on the rate of Bernard's salary at the time of the signing of the contract to establish Bernard's salary entitlement for the entire four-year term.

In this regard, it should be noted that although the facts asserted in defendants' Rule 12(M) statement are taken as uncontroverted and, therefore, true, those facts must be viewed in the light most favorable to plaintiffs. This means that summary judgment is not appropriate if a choice between

reasonable inferences has a material affect on the outcome. *Smith*, 129 F.3d at 426 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).[6] In the present case, the figures representing Bernard's salary contained in defendants' Rule 12(M) statement are taken as true. However, these figures give rise to a choice of reasonable inferences regarding the rate of salary to which Bernard was entitled during the course of his four-year term of employment.

■ The second clause of the contract guarantees Bernard "15% of the net profit from Mogo, Inc. to be paid on a Quarterly basis" as long as he is in Mogo's employ. However, the clause is ambiguous as to the method of computing Bernard's 15% share of net profits. One reasonable interpretation is that Bernard is entitled to 15% of any net profits secured by Mogo over the course of the full four year term. Under this interpretation, Bernard is entitled to nothing, since Mogo made a net loss over the four year term. Alternatively, the clause might be interpreted as guaranteeing Bernard 15% of the net profits secured during any quarter in which Mogo earned such a profit. Indeed, Mogo appears to concede the possibility of this interpretation when it states that Bernard has received more than $9,001.15, *i.e.*, 15% of the total net income secured by Mogo in 1994. *See* Def. 12(M) Statement at ¶ 12. Even assuming that Bernard were entitled to $9,001.15 under the second clause of the contract, it is not possible to determine whether he has actually received that sum, since a genuine issue remains as to his entitlements in respect of salary and compensation. In any event, the second clause is susceptible to at least two reasonable interpretations. Since the clause is ambiguous, extrinsic evidence may be considered in order to determine the intentions of the parties. However,

no such evidence has been presented to assist in resolving this ambiguity.

There remain genuine issues as to the parties' intentions regarding the first and second clauses of the contract which preclude the entry of summary judgment in favor of defendant Mogo. Accordingly, defendants' motion for summary judgment will be denied with respect to Count II.

### Count III: Trespass

■ In Count III, plaintiffs bring a state law claim for trespass. It is alleged that, in order to repossess its motor vehicle, Mogo intentionally invaded plaintiffs' property without permission or invitation or any other right. Plaintiffs complain that Mogo's actions were wilful and wanton and that they caused plaintiffs great emotional distress. They seek compensatory and punitive damages. Mogo contends that plaintiffs have no cause of action for trespass since it was entitled to acquire its property from a wrongful holder in a peaceful manner.[7] It points out that it was the absolute owner of the motor vehicle and that plaintiffs had no immediate right to possession of it. Mogo further contends that the alleged injury is too remote in the circumstances. Plaintiffs respond by reiterating their contention that the facts support a cognizable claim of trespass giving rise to compensatory and punitive damages for emotional distress. They contend that there are genuine issues of material fact which preclude the entry of summary judgment for defendants on Count III.

A trespass is an invasion in the exclusive possession and physical condition of land. *Millers Mut. Ins. Assoc. of Illinois v. Graham Oil Co.*, 282 Ill.App.3d 129, 218 Ill.Dec. 60, 668 N.E.2d 223, 230 (1996); *Freese v. Buoy*, 217 Ill.App.3d 234, 160 Ill.Dec. 222, 576 N.E.2d 1176, 1182 (1991); *Dietz v. Illinois Bell Tel. Co.*, 154 Ill.App.3d 554, 107

---

**6.** As the Seventh Circuit noted in *Smith,* failure to submit a Rule 12(N) statement limits the scope of facts which the court may take into account but "[r]educing the pool from which these inferences may be made does not change this maxim of our jurisprudence." *Smith,* 129 F.3d at 426.

**7.** Defendants treat plaintiffs' trespass claim as if it were a claim for trespass to personal property as well as a claim of trespass to land. However,

the essence of plaintiffs' trespass claim is that Mogo intentionally invaded plaintiffs' premises in order to remove the motor vehicle. *See* Amended Complaint at paragraph 34. Count III does not set out the elements of an independent claim of trespass to personal property. Moreover, the cases cited by plaintiffs in response to defendants' motion for summary judgment deal solely with the issue of trespass to land.

Ill.Dec. 360, 507 N.E.2d 24, 26 (1987). In Illinois, one can be liable in trespass for causing a third person to enter the land of another. *Millers Mut.Ins.,* 218 Ill.Dec. 60, 668 N.E.2d at 230. However, a person must know with a high degree of certainty that the intrusion will naturally flow from his act before liability for trespass attaches. *Freese,* 160 Ill.Dec. 222, 576 N.E.2d at 1182. A person is liable for an intentional intrusion on land irrespective of whether he or she causes harm to a legally protected interest. *Dial v. City of O'Fallon,* 81 Ill.2d 548, 44 Ill.Dec. 248, 411 N.E.2d 217, 220 (1980).

A trespasser enters the premises of another for his or her own purposes without permission, invitation or other right. *Hendle v. Stevens,* 224 Ill.App.3d 1046, 166 Ill.Dec. 868, 586 N.E.2d 826, 832 (1992). However, no liability for trespass attaches when a person's actions are based on privilege or implied consent. *Desnick v. American Broadcasting Cos.,* 44 F.3d 1345, 1351 (7th Cir.1995). One such privilege arises when a person is entitled to the immediate possession of a chattel which has come upon the land of another otherwise than with the putative trespasser's consent or by his or her tortious conduct. Such a person is privileged to enter the land at a reasonable time and in a reasonable manner in order to remove the chattel. But he or she is subject to liability for any harm done to any legally protected interest of the owner of the land, except where the chattel is on the land through the tortious conduct of the possessor. *See Restatement (Second) of Torts* § 198 (1965) ("Restatement").

It is undisputed that Mogo was the owner of the vehicle at all times relevant to this lawsuit but that the car was kept in Bernard's possession and used by him as his company car while he worked for Mogo. Mogo wanted the vehicle back, but Bernard refused to return it until such time as Mogo paid all monies he considered owing to him. Mogo then took the matter into its own hands and, through the actions of its agent, came onto plaintiffs' land without their consent and removed the vehicle. While an unauthorized intrusion of this nature generally constitutes a trespass, a question remains as to whether Mogo was privileged to enter plaintiffs' land in order to reclaim the vehicle. As the owner of the vehicle, Mogo was entitled to immediate possession of it at the termination of Bernard's employment, if not at all relevant times. However, it cannot be said that the vehicle came to be housed at plaintiffs' residence without Mogo's consent. During the course of his employment, Bernard took custody of the vehicle and kept it at his residence with Mogo's consent. The detention of the vehicle on plaintiffs' land after the termination of Bernard's employment may have been wrongful but whether this is sufficient to bring Mogo within the terms of the privilege stated above is an open question. *See Restatement,* § 198, Cmt a at 362. The parties do not cite any authority that speaks directly to this issue. In any event, it is not necessary to determine definitively whether Mogo was privileged to enter plaintiffs' premises in order to remove the vehicle. Even assuming that plaintiffs could show that Mogo had committed a trespass, they have failed to demonstrate that there is a genuine issue of material fact as to whether plaintiffs suffered injury on account of Mogo's actions.

In a trespass action, compensatory damages can be awarded for actual or substantial injury to realty and are generally measured by the difference in the fair market value of the property before and after the trespass. *Rodrian v. Seiber,* 194 Ill.App.3d 504, 141 Ill.Dec. 585, 551 N.E.2d 772, 774 (1990). Nominal compensatory damages can be awarded when no actual or substantial injury has been alleged or proved, since the law infers some damage from the unauthorized entry of land. *Gavcus v. Potts,* 808 F.2d 596, 598 (7th Cir.1986). In the present case, however, plaintiffs do not seek compensation in respect of the unauthorized entry onto their premises by Mogo's agent. Nor do they contend that Mogo's action resulted in any damage to their real or personal property. Accordingly, no issue of compensatory or nominal damages for injury to property arises.

The law permits the recovery of consequential damages in respect of injuries that are the natural and proximate result of a tortious act. In a diversity case governed by

the law of Wisconsin, the Seventh Circuit recognized that when a trespass causes mental distress, the trespasser is liable in damages for the mental distress and any resulting illness or physical harm. *Gavcus*, 808 F.2d at 598 (citing 22 Am.Jur.2d *Damages* § 136; 38 Am.Jur.2d *Fright, Shock, and Mental Disturbance* § 30; 75 Am.Jur.2d *Trespass* § 58). Similarly, courts in a number of jurisdictions have held that when emotional distress is a natural consequence of a tort, it may be properly regarded as an additional element of damage incidental to the tort claim. *Charlie Stuart Oldsmobile, Inc. v. Smith*, 171 Ind.App. 315, 326, 357 N.E.2d 247, 253 (1976); *Lloyd v. North Broward Hosp. Dist.*, 570 So.2d 984, 988 (Fla. App.1990); *Niblo v. Parr Manufacturing, Inc.*, 445 N.W.2d 351, 355 (Iowa 1989).

■ As a general matter, Illinois courts are reluctant to allow recovery for purely mental or emotional distress. *Rickey v. Chicago Transit Authority*, 98 Ill.2d 546, 75 Ill.Dec. 211, 457 N.E.2d 1, 5 (1983). As the Illinois Supreme Court explained in *Rickey*, "courts have given as reasons for this reluctance apprehensions that the door would be opened for fraudulent claims, that damages would be difficult to ascertain and measure, that emotional injuries are hardly foreseeable and that frivolous litigation would be encouraged." *Id. Rickey* stands for the proposition that mental anguish and emotional distress unaccompanied by other physical injury are not compensable injuries in negligence actions. *Id.* 75 Ill.Dec. 211, 457 N.E.2d at 4–5. This principle has also been extended to strict liability tort actions. *Rahn v. Gerdts*, 119 Ill.App.3d 781, 74 Ill.Dec. 378, 455 N.E.2d 807, 809 (1983). However, the Illinois Supreme Court has also recognized that damages can be established when a primary emotional response is accompanied by a secondary response that includes physical symptoms. *Corgan v. Muehling*, 143 Ill.2d 296, 158 Ill.Dec. 489, 574 N.E.2d 602, 608 (1991). In any event, a plaintiff must demonstrate that the emotional distress inflicted is severe. *Doe v. Northwestern University*, 289 Ill.

App.3d 39, 224 Ill.Dec. 584, 682 N.E.2d 145, 151 (1997). Indeed, proof of severe emotional distress is also required in cases of intentional infliction of emotional distress where physical injury is not a prerequisite to recovery. *McGrath v. Fahey*, 126 Ill.2d 78, 127 Ill.Dec. 724, 533 N.E.2d 806 (1988); *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill.App.3d 30, 225 Ill.Dec. 944, 684 N.E.2d 935, 942 (1997); *Bristow v. Drake Street, Inc.*, 41 F.3d 345, 349 (7th Cir., 1994).[8]

The distress suffered by Rhonda is based primarily on her experience as a witness and participant in the incident involving the removal of the motor vehicle. It is undisputed that the removal of the vehicle was peaceful in the sense that it did not result in damage to plaintiffs' property or in any form of verbal or physical altercation between Mogo's agent and any member of the Livers family. The incident greatly upset Rhonda, causing her to cry and shake uncontrollably and to feel emotionally overwhelmed for the remainder of that day and night. But, other than the propensity to shake physically, there is no evidence that the distress Rhonda suffered had any physical manifestations. Above all, her condition was not sufficiently severe to compel her to seek or receive any medical attention at the time. In fact, approximately nine months elapsed before she consulted a doctor. Rhonda testified that the doctor diagnosed her as suffering from depression. Yet plaintiffs have produced no medical evidence to explain the nature, extent and cause of Rhonda's illness or the cost of any necessary treatment. Indeed, even assuming that plaintiffs could prove that Rhonda suffered from depression, plaintiffs have made no attempt to show that Rhonda's condition came about as a consequence of the incident involving the taking of the vehicle.

Since Bernard was not a witness to the taking of the motor vehicle, his claim rests solely on the fear and emotional distress engendered by the fact that the incident took place. The incident is said to have provoked in both plaintiffs concerns about the security

---

8. The Amended Complaint does not allege intentional infliction of emotional distress. In order to succeed in that cause of action, plaintiffs would have to show that Mogo acted with the requisite intent and that its conduct was extreme and outrageous. *Adams*, 292 Ill.App.3d 30, 225 Ill.Dec. 944, 684 N.E.2d 935 at 941.

of their home and the safety of their children. However, the allegation in the Amended Complaint that such anxiety forced them to leave the state is contradicted by Rhonda's own testimony that plaintiffs moved to Alabama for Bernard's work. Plaintiffs intimate that they feared further untoward action on the part of Mogo, but the record reveals no tangible basis for such a fear. With the return of the company car, Mogo had no outstanding claims against Bernard. Nor is it suggested that plaintiffs had reason to fear retaliatory action on the part of Mogo following the initiation of the present lawsuit. In these circumstances, a reasonable factfinder could not conclude that plaintiffs had substantial grounds to fear interference, harassment or similar action on the part of Mogo.

Plaintiffs fail to specify the nature and extent of any physical or psychological injury suffered by Bernard. There is no evidence to suggest that he received medical treatment at any relevant time and, as in the case of Rhonda, no medical evidence is presented to support Bernard's claim. Finally, even assuming that Bernard could prove that he suffered emotional distress, plaintiffs have failed to establish a genuine issue as to whether that distress was caused by the incident involving the removal of the vehicle, as opposed to other factors, such as the loss of his job. In these circumstances, plaintiffs have failed to establish a genuine issue as to whether they suffered medically verifiable manifestations of severe emotional distress.

[■] Finally, no issue of punitive damages arises in respect to Count III. Illinois does not recognize a cause of action for punitive damages alone; for an award of punitive damages to be sustained, actual or compensatory damages must have been awarded. *Kemner v. Monsanto Co.*, 217 Ill.App.3d 188, 160 Ill.Dec. 192, 576 N.E.2d 1146, 1153 (1991); *Florsheim v. Travelers Indemnity Co. of Illinois*, 75 Ill.App.3d 298, 30 Ill.Dec. 876, 393 N.E.2d 1223, 1233 (1979). Since plaintiffs provide no proof that they are entitled to actual or compensatory damages, they cannot be entitled to punitive damages.

Plaintiffs contend that defendants' motion for summary judgment should be denied on the ground that defendants have not established the absence of this or other material issues of fact with respect to Count III. But plaintiffs overstate the burden of proof resting on defendants as movants for summary judgment. Once defendants have satisfied their initial burden of demonstrating the absence of evidence supporting plaintiffs' case, plaintiffs must come forward with evidence establishing that there is a genuine issue in respect of those matters for which plaintiffs bear the burden of proof at trial. *Selan*, 969 F.2d at 564. Since plaintiffs would bear the burden of proof as to consequential damage, the burden was on them to provide proof of consequential damage in response to the summary judgment motion. Similarly, the burden was on plaintiffs to establish that the incident involving the removal of the car was the proximate cause of the injury in question. Plaintiffs have failed in both of these tasks. Accordingly, defendants' motion for summary judgment will be granted in respect to Count III.

IT IS THEREFORE ORDERED that defendants' motion to disqualify [32] is denied. Defendants' motion for summary judgment [29] is granted in part and denied in part. Count I is dismissed without prejudice to plaintiffs' moving for costs and attorneys fees. Count III is dismissed. Defendants Ming Wu and Ken Kuo are dismissed from this action. In open court on February 26, 1998 at 9:15 a.m., the remaining parties shall file an original and copy of a topbound, final pretrial order in full compliance with Local Rule 5:00.